# In the United States Court of Federal Claims

No. 19-946C

(Filed: October 28, 2020)

| | |
|---|---|
| **EHREN-HAUS INDUSTRIES, INC.,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**UNITED STATES,** )<br>)<br>**Defendant.** )<br>) | Motion for protective order limiting breadth of deposition notices; RCFC 30(b)(6); relevancy; undue burden or expense |

Joseph A. Whitcomb, Whitcomb, Selinsky, P.C., Denver, Colorado, for plaintiff. With him on the briefs was Joel L. Hamner, Whitcomb, Selinsky, P.C., Denver, Colorado.

Miles K. Karson, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Jeffrey Bossert Clark, Acting Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and Niketa Wharton, Associate Counsel, DLA Counsel – Aviation, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge

Plaintiff, Ehren-Haus Industries, Inc. ("Ehren-Haus"), and defendant, the United States Defense Logistics Agency ("DLA"), entered into a contract for the manufacture and delivery of radar cable assemblies used in F-18 Hornet aircraft.[1]  Under the contract, Ehren-Haus was required to submit two sample cable assemblies to the DLA 150 days after receipt of the first cable assembly order.  Pl.'s Second Am. Compl. ¶ 23, ECF No. 8-16; Pl.'s Compl. Ex. A, ("Contract") at 4, ECF No. 1-1.  Upon receipt of the samples, the DLA had 30 days to conduct first article testing ("FAT") on the sample cable assemblies.  Contract at 4.  The FAT procedure required the government to "inspect and test" the samples provided by Ehren-Haus, and "either reject the samples or approve them for full-rate production" within the 30-day window specified in the contract.  Pl.'s Resp. to Def.'s Mot. at 2, ECF No. 24.  Ehren-Haus alleges that the

---

[1] References to the "United States," the "United States Defense Logistics Agency," the "government," and the "DLA" all refer to defendant and its collective entities and actions.

government failed to meet the 30-day deadline for completing FAT, causing Ehren-Haus to suffer damages in the form of additional test costs and unabsorbed overhead expenses. 2d Am. Compl. ¶ 24; Hr'g Tr. 22:20 to 23:4 (Sept. 28, 2020).[2] Despite passing the FAT testing, a portion of the cable assemblies Ehren-Haus delivered proved to be defective because of a faulty component obtained from a government-approved supplier. Compl. ¶ 3. The government consequently "directed [Ehren-Haus] to develop a 'get-well plan' to identify defects in the [supplied component] and to perform testing and evaluation of the defective [component] that was beyond the scope of the tests required by the contract," resulting in "unforeseeable delays and additional expenses." 2d Am. Compl. ¶ 5.

Pending before the court is defendant's motion for a protective order, filed September 1, 2020. *See* ECF No. 23 ("Def.'s Mot."). The government's motion addresses Topics 11, 12, and 13 listed in Ehren-Haus's Notice of Rule 30(b)(6) Deposition. *See* Def.'s Mot. Ex. 1 at 4, ECF No. 23-1.[3] The government avers that these three topics are "overly broad and unduly burdensome in that they are not relevant" to the claims at issue in this case. Def.'s Mot. at 1. Ehren-Haus contends that the three topics as written are relevant to determining whether the government complied with its contractual obligations as well as its own policies, practices, and procedures for conducting FAT. *See* Pl.'s Resp. at 6-7. After briefing, *see* Pl.'s Resp.; Def.'s Reply to Pl.'s Resp., ECF No. 25, the court held a hearing on September 28, 2020. The motion is ready for disposition.

The court concludes that portions of Topics 11 and 13 are relevant to determining whether the government's performance of FAT on the samples provided by Ehren-Haus met the requirements of the contract. However, Topic 12 is overly broad in requiring the government to disclose policies and procedures that are not at issue in the present case. Pursuant to Rule 30(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), the government must produce a witness to testify about Topic 11 to the extent that it covers first article testing requirements under the contract at issue, and Topic 13. The government is not, however, required to produce a

---

[2] The date will not be shown in further citations to the transcript of this hearing.

[3] Ehren-Haus' Notice requests that the government provide a witness to testify about

> Topic Number 11: All requirements of the first article testing and approval contemplated in Plaintiff's Request for Admission No. 3 (the "FAT").
>
> Topic Number 12. Defendant's policies, practices, and procedures for conducting first article testing and approval, generally.
>
> Topic Number 13. All facts and circumstances related to Defendant's performance of the FAT, including Defendant's inspection of Plaintiff's proffered cable assemblies, any delays related to the same, and the reason(s) for any such delays.

Def.'s Mot. Ex. 1.

2

witness to testify about Topic 12. Accordingly, the government's motion is GRANTED in part and DENIED in part.

## BACKGROUND[4]

On May 21, 2014, Ehren-Haus entered into an indefinite purchase delivery order contract with the Defense Logistics Agency for the manufacture of radar cable assemblies used in F-18 Hornet aircraft. Contract at 3; 2d Am. Compl. ¶ 21. While DLA was the named party in the contract, the Department of the Navy was the anticipated "end user" of the cable assemblies. Hr'g Tr. 10:10-13. Ehren-Haus was required under the Contract to provide two sample cable assemblies to the DLA. Contract at 4. DLA generally requires manufacturers to submit such samples for first article testing when manufacturers are contracting with the government for the first time, or a substantial amount of time has passed between the manufacturer's most recent government contract and the current one. *See* Hr'g Tr. 9:23-10:10. While Ehren-Haus contracted with DLA to manufacture the cable assemblies, the Department of the Navy conducted the first article testing. *Id.* at 10:10-13. Upon receipt of the samples, the government had 30 days to conduct first article testing and notify Ehren-Haus as to whether the cable assemblies were satisfactory. Contract at 4; Hr'g Tr. 8:13-18.

Ehren-Haus used cable connectors manufactured by Amphenol in its cable assemblies. 2d Am. Compl. ¶ 22. Amphenol was the only approved supplier available to Ehren-Haus at the time the parties entered into the Contract, as other suppliers had ceased production of the connector necessary for the cable assemblies. Hr'g Tr. 20:9-23. Ehren-Haus submitted samples of the assemblies on February 18, 2015, but DLA notified Ehren-Haus of the testing results on June 19, 2015, 90 days after the end of the 30-day period specified in the contract. 2d Am. Compl. ¶ 24. On October 6, 2015, the parties modified the Contract to change the delivery date from August 31, 2015 to November 30, 2015. 2d Am Compl. Ex. V1, ECF No. 8-4. This modification agreement stated that "[t]here is no contractual liability for this delay." *Id.* at 2. During the 90-day delay, however, Ehren-Haus incurred overhead expenses from remaining on "standby" to produce the cable assemblies. 2d Am. Compl. ¶ 24.

Once production began, the Defense Contract Management Agency provided a Quality Assurance Specialist to oversee production on-site. Hr'g Tr. 14:9-24. On April 8, 2016, after Ehren-Haus had made initial deliveries of cable assemblies, the Quality Assurance Specialist assigned to monitor production of the assemblies informed Ehren-Haus that DLA had placed Amphenol on a "Stop Shipment" order for being "delinquent on a number of required tests to confirm [that] their parts meet required specifications." Compl. Ex. B at 6, ECF No. 1-2. As a result of the order issued against Amphenol, Ehren-Haus received a "Stop-Work/Stop-Shipment Order" on April 12, 2016. 2d Am. Compl. ¶ 25; Compl. Ex. C, ECF No. 1-3. However, after concluding that the Amphenol connectors Ehren-Haus used in its assemblies were not affected

---

[4] The recitations that follow do not constitute findings of fact, but rather are recitals attendant to the pending motions and reflect matters drawn from the complaint, the parties' briefs, and records and documents appended to the complaint and briefs.

by the stop-shipment order issued against Amphenol, DLA lifted the stop-work/stop-shipment order issued against Ehren-Haus on May 5, 2016.  2d Am. Compl. ¶ 28.

Unfortunately, some of Ehren-Haus' cable assemblies "did not work when [they] were installed in the fighter aircraft."  Compl. ¶ 30.  On August 18, 2016, DLA sent a Notice of a Product Quality Deficiency Report to Ehren-Haus, explaining that cable assemblies had been "installed and failed [a] resistance check."  2d Am. Compl. Ex. X at 6-7, ECF No. 8-6.  DLA issued a second stop-work/stop-shipment order to Ehren-Haus based on the Deficiency Report, 2d Am. Compl. Ex. Y, ECF No. 8-7, and directed Ehren-Haus to develop a "get-well plan" to address the defective connectors, 2d Am. Compl. ¶ 5.  After receiving the order, Ehren-Haus concluded that the cable assemblies "required additional testing protocols, not included in the Contract, to ensure suitability upon delivery," 2d Am. Compl. ¶ 33, and implemented the protocols, 2d Am. Compl. ¶ 72.  After conducting a Process Review, the Defense Contract Management Agency concluded that Ehren-Haus was not at fault for the deficiency:

> FINDINGS: RECOM[M]ENDATION FOR PQDR (NO CONTRACTOR FAULT)
>
> The Non-Conformance is deep in the connector supplied to EHREN-HAUS with a COC [Certificate of Compliance] from Amphenol. The Drawings for that specific connector/adaptor are <u>Restricted and Controlled</u>. EHREN-HAUS has NO ACCESS; They are not and have not been in possession of the drawings and therefore would not and could not have known how it should have been made. They relied on the COC as provided by Amphenol along with the fact that Amphenol was the only supplier of said Connector and cross referenced to our "Government Rated" purchase orders.

Compl. Ex. D at 18, ECF No. 1-4 (emphasis in original).

On February 14, 2017, after verifying the efficacy of the additional testing protocols Ehren-Haus had implemented to detect deficient Amphenol connectors, DLA lifted the stop-work/stop-shipment order.  Compl. Ex. H, ECF No. 1-8.  On April 25, 2017, Ehren-Haus submitted a Request for Equitable Adjustment to DLA for the costs of implementing the new testing protocols.  *See* Compl. Ex. J, ECF No. 1-10.  DLA granted the request in part, compensating Ehren-Haus for $144,292.12.  *See* Compl. Ex. M, ECF No. 1-13.  On May 17, 2018, Ehren-Haus submitted a Contract Disputes Act claim for delay expenses, which DLA denied.  *See* Compl. Ex. S, ECF No. 1-19.  On May 23, 2018, Ehren-Haus submitted a second Contract Disputes Act claim.  2d Am. Compl. Ex. U, ECF No. 8-2.  DLA responded that Ehren-Haus had "already received a final decision on the allegations" and stated that it would not be responding to the second claim.  2d Am. Compl. Ex. W, ECF No. 8-5.  On June 28, 2019, Ehren-Haus filed suit in this court, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, constructive change, and cardinal change.  2d Am. Compl. ¶¶ 3, 7, 61.

Ehren-Haus alleges two categories of damages: the costs incurred from inspecting the assemblies and implementing new testing protocols, and overhead costs for the delay periods.  Hr'g Tr. 22:20-23:4.  In providing the government with its Notice of Rule 30(b)(6) Deposition,

4

Ehren-Haus seeks the first article test results for the cable connectors to determine whether the Navy's testing procedures could have disclosed the ability of some Amphenol cable connectors to perform as required under the Contract. *See* Hr'g Tr. 23:5-9. On September 1, 2020, the government filed a motion for a protective order, Def.'s Mot., and has asked the court to narrow Topics 11, 12, and 13 of the Notice "to the relevant issues of, one, the contract requirements for first article testing; two, any so-called delays relating to the testing; and three, reasons for those delays," Hr'g Tr. 6:19-22.

## STANDARDS FOR DECISION

Rule 30(b)(6) of the Rules of the United States Court of Federal Claims authorizes a party to depose an entity or governmental agency by serving a deposition notice describing "with reasonable particularity the matters for examination." RCFC 30(b)(6). The entity or agency named in the deposition notice "must . . . designate one or more . . . persons who consent to testify on its behalf." *Id.* Rule 26(b)(1) limits of the scope of discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." RCFC 26(b)(1). The party moving for a protective order must show "good cause" for granting the order. RCFC 26(c)(1). "To meet the 'good cause' standard of the rule so as to preclude a deposition, the party seeking a protective order must show 'that the discovery request is considered likely to oppress an adversary or might otherwise impose an undue burden.'" *Boston Edison Co. v. United States*, 75 Fed. Cl. 557, 561 (2007) (quoting *Forest Prods. Nw., Inc. v. United States*, 453 F.3d 1355, 1361 (Fed. Cir. 2006)).

"Questions of the scope and conduct of discovery are, of course, committed to the discretion of the trial court." *3rd Eye Surveillance, LLC v. United States*, 143 Fed. Cl. 103, 109 (2019) (quoting *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 797 (Fed. Cir. 1984)). Discovery is subject to "ultimate and necessary boundaries," but "discovery rules 'are to be accorded a broad and liberal treatment.'" *DNC Parks & Resorts at Yosemite, Inc. v. United States*, 137 Fed. Cl. 708, 710 (2018) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)); *see also Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1322 (Fed. Cir. 1990) ("[T]he Federal Rules . . . unquestionably allow broad discovery."). Moreover, "[a]lthough Rule 26(c) permits parties to seek protective orders respecting information that is 'outside the scope permitted by RCFC 26(b)(1),' . . . any protective order must be 'appropriately tailored.'" *3rd Eye Surveillance*, 143 Fed. Cl. at 109-10 (citing *DNC Parks*, 137 Fed. Cl. at 710) (internal citation omitted).

## ANALYSIS

*Topic 11 of Ehren-Haus' Notice*

Topic 11 of Ehren-Haus' Notice of 30(b)(6) Deposition requests that the government produce a witness to testify about "[a]ll requirements of the first article testing and approval contemplated in Plaintiff's Request for Admission No. 3 (the 'FAT')." Def.'s Mot. Ex. 1 at 4. The government asserts that Topic 11 is overly broad and unduly burdensome because it requests information beyond the scope of the relevant issues of the case. *See* Def.'s Mot. In its motion for a protective order, the government claimed that that "[t]he first article testing itself . . . is not

at issue and is not relevant." *Id*. at 7. Ehren-Haus counters that the government's understanding of the requirements under the contact for first article testing "is certainly relevant to whether it met those requirements," Pl.'s Resp. at 6, and points out that "the facts and circumstances of the government's FAT performance" may reveal whether the government could have identified deficiencies in the cable assemblies before they were installed in aircraft, *see* Pl.'s Resp. at 7.

The government has subsequently acknowledged that the "first article testing requirements *under the contract at issue*" are relevant and proportional matters for discovery. Def.'s Reply at 4 (emphasis added); *see also* Hr'g Tr. 9:5-7 (Mr. Karson: "[O]n Topic 11, we are prepared to present a designee on what the contract provisions require relating to first article testing."). While Topic 11 could be construed as requesting information regarding first article testing generally, the court interprets the Topic to be limited to "all requirements of the first article testing and approval" of Ehren-Haus' cable assemblies. Therefore, Topic 11 is permissible to the extent that it covers first article testing requirements under the contract at issue.

*Topic 12 of Ehren-Haus' Notice*

Topic 12 of Ehren-Haus' Notice requests that the government produce a witness to testify about "[d]efendant's policies, practices, and procedures for conducting first article testing and approval, generally." Def.'s Mot. Ex. 1 at 4. The government argues that this topic encompasses irrelevant information in that it "goes beyond how the [g]overnment tested [Ehren-Haus'] prototype cable assemblies" to cover "how the [g]overnment conducts ***all*** first article testing, regardless of the type of deliverable being tested." Def.'s Mot. at 7 (emphasis in original). Ehren-Haus asserts that "whether the government performed the FAT in accordance with its *own* policies, practices, and procedures (as raised in Topic 12)" is "essential" to determining whether the first article testing requirements were sufficient to detect the deficiencies in the cable assemblies. Pl.'s Resp. at 7 (emphasis in original).

While the government's compliance with its own first article testing requirements is relevant to Ehren-Haus' claims of breach and change, the language of Topic 12 reaches beyond the government's performance under the contract at issue. The Navy, as the designated end user of the cable assemblies, conducted the first article testing. Hr'g Tr. 10:10-13. As noted by the government, "[o]ther military departments conduct first article testing as well." Hr'g Tr. 11:20-21. Given the fact that numerous discrete government entities may perform first article testing in different ways, the request for production of a witness to testify about the government's "policies, practices, and procedures for conducting first article testing and approval, generally," Def.'s Ex. 1 at 4, amounts to a request for information far beyond the Navy's procedures for conducting such testing of the cable assemblies. While "discovery rules are to be accorded a broad and liberal treatment," information regarding the government's general procedures for conducting first article testing falls outside the "ultimate and necessary boundaries" of discovery. *DNC Parks*, 137 Fed. Cl. at 710 (internal quotations and citation omitted). The overly broad scope of Topic 12 thus gives rise to "good cause . . . to preclude a deposition" under this topic, as the government has demonstrated that "the discovery request . . . might . . . impose an undue burden." *Boston Edison Co.*, 75 Fed. Cl. at 561 (citation omitted).

6

*Topic 13 of Ehren-Haus' Notice*

Topic 13 of Ehren-Haus' Notice requests that the government produce a witness to testify about "[a]ll facts and circumstances related to [d]efendant's performance of the FAT, including [d]efendant's inspection of [p]laintiff's proffered cable assemblies, any delays related to the same, and the reason(s) for any such delays." Def.'s Mot. Ex. 1 at 4. The government asks the court to limit testimony on Topic 13 "to the relevant issues of (i) contractual obligations relating to first article testing, (ii) any delays relating to the [g]overnment's first article testing of E[hren-Haus'] samples, and (iii) the reasons for any such delays." Def.'s Mot. at 8. The government has acknowledged that the "'so-called delays' relating to the testing and the reasons for those delays" are relevant, and that it will produce a witness to testify on these topics. Hr'g Tr. 8:23-9:2. Ehren-Haus contends that the relevance of Topic 13 as written is unquestionable, as testimony on this topic may reveal whether the government "performed the FAT[] at all; whether it did so in accordance with its Contractual requirements; and whether it completed them in a timely manner." Pl.'s Resp. at 6.

While the government contends that Topic 13 is only relevant to the extent that it covers Ehren-Haus' claim for delay-related damages, *see* Hr'g Tr. 8:23-9:2, the subject matter of this topic is also relevant to Ehren-Haus' claims for breach of contract, cardinal change, and constructive change. The text of Topic 13 is tailored to the Navy's first article testing under the contract at issue and the results of that process. After the DLA notified Ehren-Haus of the testing results and Ehren-Haus necessarily made initial deliveries, there was an unacceptable failure rate of the cable assemblies. *See* Hr'g Tr. 26:7-9 (Mr. Karson: "I think the failure rate was close to something like one in three."). A deposition topic regarding "[d]efendant's inspection of [p]laintiff's proffered cable assemblies, any delays related to the same, and the reason(s) for any such delays," Def.'s Mot. Ex. 1 at 4, could reveal whether the testing procedures conducted by the Navy could have detected the failure rate of the cable assemblies before the government accepted Ehren-Haus' deliveries. The adequacy of the Navy's testing procedures and the fact that Ehren-Haus implemented additional procedures after receiving the stop-work/stop-shipment order are key to Ehren-Haus' claims of constructive change and cardinal change. *See* 2d Am. Compl. ¶¶ 70-78. Therefore, Topic 13 is "relevant to [a] party's claim . . . and proportional to the needs of the case . . . ." RCFC 26(b)(1).

## CONCLUSION

Pursuant to RCFC 26(c)(1), the government's motion is GRANTED in part, as to Topic 11 to the extent that it covers matters beyond the first article testing requirements under the contract at issue, and as to Topic 12 in its entirety. The government's motion is DENIED in part, as to Topic 11 as it relates to the first article testing requirements under the contract, and as to Topic 13 in its entirety.

It is so **ORDERED**.

s/Charles F. Lettow
Charles F. Lettow
Senior Judge